[No. A073037. First Dist., Div. Two. Feb. 25, 1997.]

SCOTT R. MAYER, Plaintiff and Appellant, v.
MULTISTATE LEGAL STUDIES, INC., Defendant and Respondent.

**[Opinion certified for partial publication.\*]**

*Pursuant to rules 976 and 976.1 of the California Rules of Court, this opinion is certified for publication except for parts III.B and III.C.

**COUNSEL**

Belden, Abbey, Weitzenberg & Kelly and Lewis R. Warren for Plaintiff and Appellant.

Kauff, McClain & McGuire, Jeffrey D. Polsky, A. Roger Jeanson and Keith Chrestionson for Defendant and Respondent.

**OPINION**

**KLINE, P. J.—**

## I. INTRODUCTION

This appeal arises out of plaintiff Scott R. Mayer's wrongful termination by defendant Multistate Legal Studies, Inc. Plaintiff contends that the trial

court awarded inadequate damages. We agree and reverse for further proceedings. Specifically, we conclude that the trial court incorrectly ruled that plaintiff was precluded as a matter of law from recovering any contract damages for the period during which he received disability benefits. We further conclude in the unpublished portion of this decision that plaintiff may recover as part of his breach of contract damages the present value of any pension benefits to which he would be entitled under his contract notwithstanding the preemption provisions of the Employee Retirement Income Security Act of 1974 (29 U.S.C. § 1001 et seq.) (hereafter ERISA).

## II. FACTUAL AND PROCEDURAL BACKGROUND

In August of 1990, defendant, the third largest bar review company in California, hired plaintiff away from BarPassers, a major competitor, to be its regional sales manager in Northern California. Although plaintiff never passed the California Bar Examination despite numerous tries, he was a successful sales manager for BarPassers.

Plaintiff and defendant entered into a written three-year employment contract that provided for salary and guaranteed commissions of $60,000 for the first year, $67,500 for the second year, and $75,000 for the third year. Plaintiff's compensation was structured in this manner in order to account for seasonal cash flow in the industry. The contract also required defendant to contribute 15 percent of plaintiff's yearly "salary" into a pension plan.[1]

Defendant fired plaintiff on June 19, 1992, with approximately 14 months remaining under the employment contract. The trial court ruled that plaintiff's termination was wrongful. We need not detail the facts underlying this finding, since defendant does not challenge it and the issues raised on appeal relate solely to the amount of plaintiff's damages.

In early September 1992, plaintiff was diagnosed with Hodgkin's disease. Although plaintiff opined that his illness would not have prevented him from continuing to work as defendant's regional sales manager, it did prevent him from securing new employment. Plaintiff's medical treatments left him bald and frail, making it obvious to any prospective employer that he was ill. On his doctor's advice, plaintiff applied for state disability benefits. He received $9,264 in benefits between September 13, 1992, and March 24, 1993.

In January 1993, plaintiff began working on a limited basis for North Coast Carpet Care, Inc. (North Coast), a company founded by his wife. By

---

[1]Plaintiff's contract stated: "In consideration of [plaintiff's] responsibilities, he will be paid the following compensation: . . . (5) coverage in the PMBR pension plan with a yearly employer contribution totaling 15% of [plaintiff's] yearly salary." The parties stipulated that "PMBR" referred to defendant.

the middle of March 1993, plaintiff was no longer feeling the effects of his illness or treatments and he began working full-time at North Coast. Between January and August of 1993 (the balance of the term of his contract with defendant), plaintiff earned $1,000 from his employment at North Coast.

In August 1993, plaintiff filed suit against defendant for breach of contract. He sought damages based upon the compensation package he was to receive under his employment contract, less the sum of his disability payments and his earnings at North Coast.

At trial, defendant offered the testimony of an expert witness, a vocational rehabilitation counselor, who criticized plaintiff's efforts to find new employment. Neither the expert nor any other witness, however, provided evidence of the specific amount that plaintiff could have earned if he had used reasonable efforts to obtain comparable employment.

Defendant challenged plaintiff's claim for pension benefits on the ground that his claim was preempted by ERISA. Defendant's president explained that the company's profit-sharing plan was commonly referred to by defendant's employees as the company's pension plan, but that defendant did not have a pension plan per se. Plaintiff testified that it was his understanding that he would be added to an existing pension plan, not that one would be created for him. Although defendant's president testified to a vesting schedule whereby an employee first vests at a level of 20 percent at the end of the third year of employment, no documents or other evidence establishing the terms and conditions of the profit-sharing plan were entered into evidence. Defendant's president testified that he informed plaintiff of the vesting schedule at the time of contract negotiations; plaintiff testified to the contrary. Defendant's president also testified that the company made no contributions for any employee, including plaintiff, during the period of plaintiff's employment, and that the profit-sharing plan would not have permitted defendant to make 15 percent annual contributions specifically on behalf of any individual employee as required under the terms of plaintiff's employment contract.

After a four-day bench trial, the trial court found that defendant lacked good cause to terminate plaintiff's employment. The trial court, however, also found that plaintiff's receipt of disability benefits precluded him, as a matter of law, from recovering any lost earnings for the period during which he received disability benefits. The court further found that, following the first three months after his termination, plaintiff did not adequately mitigate his damages. The court finally concluded that plaintiff's claim to contractual pension plan contributions was preempted by ERISA.

Plaintiff filed a motion for new trial on the grounds that the damages awarded were inadequate. The trial court denied the motion. Plaintiff then filed a timely notice of appeal from the judgment.

### III. DISCUSSION

#### A. Lost Wages

 Plaintiff contends that the trial court awarded him only a fraction of the amount of damages for lost wages to which he was entitled under his contract with defendant. "The general rule is that the measure of recovery by a wrongfully discharged employee is the amount of salary agreed upon for the period of service, less the amount which the employer affirmatively proves the employee earned or with reasonable effort might have earned from other employment. [Citations.]" (*Smith* v. *Brown-Forman Distillers Corp.* (1987) 196 Cal.App.3d 503, 518 [241 Cal.Rptr. 916].) The trial court concluded that this general rule, commonly referred to as the *Parker* rule for its origins in *Parker* v. *Twentieth Century-Fox Film Corp.* (1970) 3 Cal.3d 176 [89 Cal.Rptr. 737, 474 P.2d 689, 44 A.L.R.3d 615], did not apply to the circumstances of the present case. The trial court reasoned that plaintiff was "precluded as a matter of law from receiving damages for the time period during which [he] was receiving disability benefits" and, therefore, the *Parker* rule was incompatible with the rather unique circumstances of the case. The trial court awarded plaintiff $11,526 (representing lost wages up to the time that plaintiff began to receive disability benefits), rather than $71,818.37 (the amount of lost wages for the balance of the contract period). We conclude that the law and the record in this case support an award of the higher sum.

In support of the judgment, the court relied exclusively upon *Pichon* v. *Pacific Gas & Electric Co.* (1989) 212 Cal.App.3d 488 [260 Cal.Rptr. 677]. In that case, a discharged employee sued his former employer for, among other things, breach of contract and negligent infliction of emotional distress. (*Id.* at p. 491.) The trial court summarily adjudicated the employee's claim for emotional injuries and subsequently dismissed the employee's contract claims on the ground that the employee's exclusive remedy was under the Workers' Compensation Act. (*Ibid.*) The Court of Appeal affirmed the portion of the ruling relating to the emotional distress claim, but reversed the ruling to the extent that it wholly precluded the employee's economic or contract damages. (*Id.* at p. 499.) In so holding, the Court of Appeal wrote: "We recognize that there is a substantial risk of double recovery if an employee does suffer a compensable injury in addition to incurring economic or contract damages as a result of the termination of employment

because, in addition to compensating for medical costs, workers' compensation compensates for lost wages for the period of disability. Thus, if these damages were calculated without regard to the period of disability for which the employee may be compensated by workers' compensation, the employee would recover twice. The appropriate solution is to set off from any damages the amount of compensation paid." (*Id.* at p. 501.)

In our view, plaintiff is correct that the *Pichon* decision does not stand for the proposition that a wrongfully terminated employee is barred as a matter of law from recovering any contract damages for any period of time that the employee was disabled. Rather, *Pichon* forecloses double recovery of economic damages that were compensated by workers' compensation benefits. (Accord, *Bevli* v. *Brisco* (1989) 211 Cal.App.3d 986, 994 [260 Cal.Rptr. 57].) In the present case, plaintiff conceded that his disability benefits should be deducted from his contract damages in performing the calculation required by *Parker*. *Pichon* requires no more.[2]

Defendant nevertheless contends that to award plaintiff lost income damages for his period of disability would place him in a better position than if the breach had never occurred. We are not persuaded by that argument.

Defendant's wrongful act, not plaintiff's illness, prevented plaintiff from performing his duties under the contract. In this respect, the present case is somewhat analogous to *Carroll* v. *Civil Service Com.* (1973) 31 Cal.App.3d 561 [107 Cal.Rptr. 557]. In that case, a discharged employee spent a total of 147 days in jail on various, separate charges of public drunkenness. In the employee's action for reinstatement and backpay, the defendant contended that the employee was not entitled to lost wages for the time that he spent in jail, since he was not ready, willing and able to perform the contract. The Court of Appeal concluded that the obligation was a mutual one and thus the defense was not available to an employer who had not offered to reinstate the employee. (*Id.* at p. 567.) "[H]aving wrongfully caused the initial discharge, the [employer] cannot take advantage of the fortuitous circumstance of a disability of the employee during the period of discharge without first having purged itself of its own wrong by offering to reinstate the employee. Otherwise the effect would be to further penalize the person wronged rather than requiring the wrongdoer to correct its initial error. It

---

[2]Because we conclude that *Pichon* is supportive of the plaintiff's position, we need not discuss in detail differences in the Workers' Compensation Act and the unemployment disability compensation scheme. We simply observe that the Workers' Compensation Act contains exclusivity provisions that do not have counterparts in the disability scheme. *Pichon* is first and foremost a decision defining the limits of recovery in light of these exclusivity provisions and much of the language defendant relies upon can be explained by this distinction.

would be equivalent to permitting a party to a contract to take advantage of its own act or omission to escape liability thereon [citation] and to benefit from its own wrong [citation]." (*Ibid.*) The court therefore held that the proper setoff was to deduct from the award of backpay the total amount of the employee's earnings from work performed in jail. (*Id.* at pp. 564, 567.)

Similarly, in *Ahlstedt* v. *Board of Education* (1947) 79 Cal.App.2d 845 [180 P.2d 949], defendant board of education contended that a wrongfully discharged employee's award of back salary should exclude salary for a period of time that she was unable to perform her duties due to illness. The trial court concluded that, unlike the present case, the illness had been caused by the wrongful discharge. The appellate court decided that such causation was an adequate reason to reject the defendant's claim. The appellate court nevertheless stated an additional reason why the requested deduction should be denied, to wit: "Furthermore, no showing of prejudice to the [defendants] appears by reason of [employee's] illness. Her inability to perform the duties of her position was not occasioned by her illness. She was excluded from her position by the acts and conduct of respondents and not by reason of her physical or mental condition." (*Id.* at p. 857.)

Implicit in these decisions is recognition of the fact that the employers were attempting to invoke an equitable principle, that of setoff, to reduce the plaintiffs' damages. "From the beginning, compensation and setoff have been permitted only when, due to the particular circumstances of the case, it is fair to do so." (*Prudential Reinsurance Co.* v. *Superior Court* (1992) 3 Cal.4th 1118, 1150 [14 Cal.Rptr.2d 749, 842 P.2d 48] (dis. opn. of Kline, J.).)

Similarly, we are convinced that the equities in the present case militate strongly against permitting plaintiff's receipt of disability compensation to wholly preclude any award of lost wages from defendant. First, to accept the trial court's ruling would force future employees finding themselves in positions similar to this plaintiff to make an unacceptable election, i.e., accept benefits needed for survival in the present or pursue a more lucrative claim against the employer that may not come to fruition for several years. This unacceptable choice contravenes the policies underlying the Legislature's decision to make disability compensation available in the first place. "The purpose of [disability compensation] is to compensate in part for the wage loss sustained by individuals unemployed because of sickness or injury and to reduce to a minimum the suffering caused by unemployment resulting therefrom. This part shall be construed liberally in aid of its declared

purpose to mitigate the evils and burdens which fall on the unemployed and disabled worker and his family." (Unemp. Ins. Code, § 2601.)[3]

Second, defendant's wrongful conduct placed plaintiff in a materially worse position when his illness struck. While defendant makes much of a purported conflict in the evidence regarding whether plaintiff actually could have continued to work at Multistate during his illness instead of relying upon disability benefits, it is clear that plaintiff's wrongful termination deprived him of the opportunity to even attempt (with or without reasonable accommodations) to perform his duties during his treatments. Moreover, it is uncontroverted by the record (and we believe by simple common sense) that a person undergoing chemotherapy for a life-threatening cancer and showing the effects thereof is not going to be successful in finding a comparable sales position.

We therefore conclude that permitting the receipt of disability benefits to constitute a total setoff of plaintiff's contractual damages for the time period of receipt of the benefits is not equitable. Under the circumstances, the only appropriate amount to set off is the amount of the disability benefits.

■ Defendant further contends, however, that plaintiff's damages must be reduced for failure to mitigate by taking reasonable steps to find comparable employment. The trial court found that plaintiff failed to mitigate his damages from the commencement of his disability period until the end of the contract. We need not evaluate the evidence supporting these findings, which was reviewed extensively by both parties. Rather, we agree with plaintiff that defendant failed to carry its burden of demonstrating the amount that plaintiff could have earned if he had succeeded in obtaining comparable employment.

As set forth in *Parker* and numerous cases applying its rule, the employer bears the burden of proving "the amount which the employee . . . has earned or with reasonable effort might have earned from other employment." (*Parker* v. *Twentieth Century-Fox Film Corp., supra,* 3 Cal.3d at p. 181.) Unless the employer carries the burden of proving this amount, the calculation mandated by *Parker* cannot be performed. The only specific evidence

---

[3]The purpose of disability compensation is similar in part to that underlying general unemployment compensation. (Unemp. Ins. Code, § 100.) Courts of this state have held that such benefits are not to be deducted from damages in wrongful termination actions. (*Billetter* v. *Posell* (1949) 94 Cal.App.2d 858, 860 [211 P.2d 621]; *Monroe* v. *Oakland Unified School Dist.* (1981) 114 Cal.App.3d 804, 810-812 [170 Cal.Rptr. 867].) Because plaintiff concedes that the disability payments that he received should be deducted from his damages, we do not consider whether an exact analogy can be drawn between the two statutory schemes. We observe, however, that the holdings of these cases support our conclusion that the receipt of disability payments should not wholly preclude plaintiff from receiving other economic damages for that period.

presented on this subject was expert testimony that a manager at a Payless could make between $50,000 and $70,000 after three to five years of employment.[4] Such evidence does not satisfy defendant's burden of proof. The only sums in mitigation proven were the disability benefits in the amount of $9,264 and plaintiff's earning from North Coast in the amount of $1,000. Accordingly, these are the only amounts that should be subtracted from plaintiff's contract wages of $82,082.37 for the period from his wrongful termination until the end of the contract.[5]

B., C.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

## IV. DISPOSITION

The judgment is reversed. The cause is remanded to the trial court with instructions to determine damages and costs in amounts consistent with this decision and to enter judgment awarding plaintiff these sums. Plaintiff is awarded costs on appeal.

Haerle, J., and Lambden, J., concurred.

Respondent's petition for review by the Supreme Court was denied May 14, 1997.

---

[4]The classified advertisements relied upon by the expert witness and referred to during oral argument of this appeal apparently were not entered into evidence.

[5]This calculation includes the August 10, 1992, raise that plaintiff contends the trial court failed to take into account in its award of damages for the period June 16, 1992, through September 13, 1992.

*See footnote, *ante*, page 1428.